IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN WICKLEIN, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF,<br><br>v.<br><br>PROGRESSIVE CORPORATION, PROGRESSIVE COMMERCIAL HOLDINGS, INC., and ARTISAN AND TRUCKERS CASUALTY COMPANY,<br><br>DEFENDANTS. | Case No. 3:24-cv-143<br><br><br><br>**Class Action**<br><br>**Jury Trial Demanded** |

**CLASS ACTION COMPLAINT**

Plaintiff John Wicklein ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Defendants Progressive Corporation, Progressive Commercial Holdings, Inc., and Artisan and Truckers Casualty Company (collectively "Progressive" or "Defendants") and alleges as follows:

**INTRODUCTION**

1. This is a class action on behalf of Plaintiff and all other similarly situated claimants in Wisconsin who received a payment for the loss of a totaled vehicle from Progressive, where Progressive used valuation reports prepared by Mitchell International, Inc. ("Mitchell")—in conjunction with J.D. Power—to determine the actual cash value ("ACV") of the totaled vehicles. By using these valuation reports, Progressive systematically undervalues claimants' totaled vehicles by applying so-called "Projected Sold Adjustments" ("PSAs") that are: (a) arbitrary; (b) contrary to appraisal standards and methodologies; and (c) not based in fact, as they are contrary

to the used car industry's market pricing and inventory management practices. PSAs should never be applied and their application in Plaintiff's situation breach the contract.

2. In the event of a "total loss" to an insured vehicle—i.e., where repair of the vehicle is impossible or uneconomical—Progressive's uniform insurance policies with Plaintiff and all putative Class Members (defined below) promises to pay the difference between "the actual cash value of the covered auto at the time of the total loss" and "any greater amount the owner of the covered auto is legally obligated to pay under a written loan or lease agreement".[1] Exhibit A, Plaintiff's Wisconsin Auto Policy ("Policy"), at 17. The Policy states that ACV is "determined by the market value, age, and condition of the vehicle at the time the loss occurs." *Id.* at 21.

3. Liability under the policy is limited to the lowest of the following: the ACV at the time of the loss, reduced by the deductible; the amount necessary to replace the vehicle, reduced by the applicable deductible; or the Stated Amount on the declarations page for a covered vehicle. *Id.* at 19–20.

4. When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under its insurance policy terms and applicable Wisconsin law, Progressive has a duty to pay, and represents that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

5. Notwithstanding these obligations and representations, Progressive fails to fulfill this obligation by taking advantage of a valuation process that employs improper and unreasonable

---

[1] The Policy states that the ACV may be reduced by unpaid finance charges, excess mileage charges, charges for wear and tear, charges for extended warranties, charges for credit insurance, past due payments, and collection or repossession expenses. Exhibit A, at 17. Plaintiff's ACV calculation was not impacted by these reductions.

2

adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment.

6. Specifically, Progressive—through Mitchell—systemically applies a PSA, which results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class Members' total loss vehicles. In the provided Vehicle Valuation Report ("VVR"), Progressive explains that the PSA represents "the fact that consumers typically negotiate a purchase price less than the list price" "where the comparable vehicle is listed for sale." Exhibit B, Plaintiff's 2023 Vehicle Valuation Report, at 11. However, a PSA is not applied in cases where there is available actual sold data for the comparable vehicle or where a comparable vehicle is listed at a "no haggle" dealership. *Id.* This reduction is contrary to appraisal standards and methodologies and is not based in fact.

7. Upon information and belief, neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Nevertheless, Progressive applies a PSA to the advertised (or listed) price of comparable vehicles to determine the "market value" of the total loss vehicles.

8. The used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate from Internet-advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or

3

friends/family discount). Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their total loss vehicles.

9. To arrive at its conclusion that consumers negotiate down the advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified PSA to artificially deflate the value of total loss vehicles.

10. This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through arbitrary, unsupported, and unjustified adjustments, benefits the insurer at the expense of the insured and violates Progressive's policies with its insureds.

11. As a result of Progressive's deceptive, fraudulent, and unfair scheme, Plaintiff and the putative class members did not receive the benefit of their bargain and sustained actual damages.

**PARTIES**

12. Plaintiff John Wicklein, at all relevant times, was a Wisconsin citizen. Plaintiff had a contract with Progressive Corporation for automobile insurance. Plaintiff's Progressive automobile insurance policy was underwritten by Artisan and Truckers Casualty Company. On October 23, 2023, Plaintiff was in a collision and Defendants deemed his vehicle to be a "comprehensive" loss. Exhibit B at 1.

13. Defendant Progressive Corporation is a public Ohio company with its corporate headquarters located at 6300 Wilson Mills Road, Mayfield Village, Ohio 44143. Progressive issues insurance policies in Wisconsin and is registered with the Wisconsin Insurance Department.

Progressive provides insurance coverage throughout Wisconsin and the United States for first-party property damage under collision and/or comprehensive coverage.

14. Defendant Progressive Commercial Holdings, Inc. is a private Delaware company with its principal place of business in Ohio. Progressive Commercial Holdings, Inc. is a wholly owned subsidiary of the Progressive Corporation.

15. Defendant Artisan and Truckers Casualty Company is a Wisconsin company with its principal place of business in Ohio. Artisan and Truckers Casualty Company is a wholly owned subsidiary of Progressive Commercial Holdings, which is a wholly owned subsidiary of the Progressive Corporation.

16. Defendants Progressive Corporation, Progressive Commercial Holdings, Inc., and Artisan and Truckers Casualty Company are herein collectively referred to as "Progressive."

## JURISDICTION AND VENUE

17. Minimal diversity exists under the Class action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)–(b), and 1453. Plaintiff and proposed Class Members are citizens of the State of Wisconsin. Defendant Progressive Corporation is an Ohio corporation that has its corporate headquarters in Ohio. Defendant Progressive Commercial Holdings, Inc. is a Delaware corporation that has its principal offices in Ohio. Defendant Artisan and Truckers Casualty Company is a Wisconsin company that has its principal offices in Ohio. At all relevant times hereto, Defendants were engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Wisconsin.

18. Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the PSA that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.

19. Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendants transact business in this District.

## FACTUAL ALLEGATIONS

20. On October 23, 2023, Plaintiff was involved in a car wreck and sustained physical damage to his vehicle, a 2011 Ford Fusion S.

21. At the time of the car wreck, Plaintiff had an auto insurance Policy with Progressive Corporation, which was underwritten by Artisan and Truckers Casualty Company. Exhibit C, Plaintiff's May 2023 Renewal Declarations Page, at 1. The Policy included comprehensive coverage for the 2011 Ford Fusion S with an ACV limit and a $500 deductible. *Id.* at 2.

22. Like all members of the putative Class, Plaintiff filed a claim with Progressive regarding the damage to his vehicle.

23. Pursuant to uniform policies and procedures, Progressive declared Plaintiff's vehicle to be a comprehensive loss and purported to offer him the ACV of his loss vehicle, as Progressive promised and represented it would under the uniform provision of its insurance policies and Wisconsin law. *See* Exhibit B at 1.

24. When calculating its valuations and claims payments, Progressive systemically employs a routine "total loss settlement process." This process involves obtaining a VVR from Mitchell. Progressive relies on the valuation provided by Mitchell as the ACV amount owed under the policy. Progressive provided a Mitchell Vehicle Valuation Report for Plaintiff's 2011 Ford Fusion S on October 30, 2023. *Id.* at 1.

25. The VVRs used by Progressive during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and

6

presented that material information in the same or substantially the same format to all putative Class Members.

26. To produce the VVR, Mitchell uses the WorkCenter Total Loss ("WCTL") methodology, a five-step process that Mitchell designed and built in conjunction with J.D. Power. The five steps of the WCTL are (1) locating comparable vehicles, (2) adjusting the price of the comparable vehicles, (3) calculating the base vehicle value by averaging the adjusted priced of the comparable vehicles, (4) calculating the loss vehicle adjustments, and (5) calculating the market value through applying the loss vehicle adjustments to the base value. *Id.* at 11.

27. Under step 2 of the WCTL, Mitchell applies several adjustments including vehicle configuration adjustments for features like differences in trim, mileage adjustments, equipment adjustments, and—at issue in this case—an adjustment that Michell refers to as the "Projected Sold Adjustment" or "PSA."

28. Progressive provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* PSA, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full:

> Projected Sold Adjustment – where the comparable vehicle is listed for sale, this adjustment reflects the fact that consumers typically negotiate a purchase price less than the list price. (There is no projected sold adjustment where the comparable vehicle has actual sold data, or where a vehicle is listed for sale at a "no haggle" dealership.)

Exhibit B at 11.

29. In truth, Progressive's PSAs do not reflect market realities and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet pricing and comparison

7

shopping. Before the ubiquity of online advertising and shopping, the "advertised" prices for used vehicles had little to do with eliciting buyers to visit a specific dealership. Instead, car buyers generally went to a local dealership that had the desired vehicle in stock. The "advertised" price was simply whatever price was listed on the physical window. Consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

30. As such, dealerships generally priced vehicles above market under the assumption that some buyers might not negotiate for a lower price and the dealership would therefore obtain higher margins on those sales. This above-market "window" price allowed for negotiation, and a downward negotiation would often occur.

31. That is simply no longer how the used car market operates. Given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.—and now appraise vehicles before acquiring them to price them to market and do not negotiate from that price.

32. In this increasingly digital marketplace, if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices and would seek out the vehicle priced to

8

market, rather than the same vehicle priced at a higher amount (i.e., above market). Given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

33. As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining ACV. Insureds have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Progressive assumes always exists without any explanation or support.

34. PSAs of -$326.00, -$416.00, -$416.00, -$520.00, -$338.00 were applied to five of the ten vehicles referenced in Plaintiff's report. *See* Exhibit B at 5–7, 9–10. Three of the vehicles received a PSA of $0.00. *Id.* at 8–10. The VVR does not provide any explanation regarding the non-uniform application of PSAs to the eight vehicles where Mitchell provided the advertise list price rather than the sold price.

35. No PSA line item was present for the two vehicles where Mitchell provided the sold price rather than the advertised list price. *Id*. at 5–6. Notably, source of the information for these two vehicles is listed as "FRANCHISE SALE – J.D. POWER AND ASSOCIATES." *Id.* Significant information is missing from these two listings when compared to the other eight. Unlike the comparison vehicles, the VVR does not provide a complete VIN or the location of where the vehicle was sold. *Id.*

36. Progressive's PSAs are contrary to appraisal standards. There are multiple generally recognized and acceptable methodologies for determining ACV, including use of comparable vehicles. Through Mitchell, Progressive begins the process of valuing total loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Progressive documents the mileage, options, and trim of the total

loss vehicle and of each comparable vehicle, which are then compared in the report before making dollar adjustments.

37. At this stage of the process, however, Progressive abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and adjust based only on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

38. Progressive thumbs the scale by discarding vast amounts of relevant data that contradict any application of a PSA and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

39. Upon information and belief, Progressive has not exercised even a modicum of curiosity to investigate whether market realities support the application of a PSA. Neither Progressive nor its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

40. Neither Progressive's form Policy nor Wisconsin law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

41. These irremediable and unjustifiable errors skew the data in favor of Progressive to the detriment of the insureds.

42. Moreover, examples abound demonstrating the glaring error of Progressive's cherry-picking practices.

43. For one example, all list prices for comparable vehicles identified in Progressive's valuation reports are scraped from Internet sources—especially from Cars.com.[2] On information and belief, Progressive applies the PSA without contacting the identified dealerships or considering whether the online retailer ever discounts its vehicles. In applying an across-the-board PSA reduction, Progressive failed to consider that (as discovery will show), given certain market forces, even the few car dealers that might negotiate prices listed in-person on car lots, do not negotiate the price listed online.

44. The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. There is no justification for Progressive to have excluded those transactions from calculating the PSA when determining the ACV of Plaintiff's and putative Class Members' totaled vehicles while only including transactions where the sold price was recorded as less than the list price.

45. Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the PSA. Doing so serves only to skew the data to meet Progressive's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds less.

---

[2] The VVR provided to Plaintiff includes two vehicles with "sold" prices rather than list prices. For both vehicles, the VVR identifies the source as a franchise sale from J.D. Power and Associates.

11

46. Progressive further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

47. Progressive also fails to control for whether the vehicle was purchased with cash (which is what is relevant to actual *cash* value), or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

48. In these instances, the ACV of the vehicle retains its price to market; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

49. Plaintiff and each member of the proposed Class was damaged by Progressive's application of these PSA because they were not paid the ACV that they would have received had Progressive applied proper methodologies and appraisal standards.

50. Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Progressive for ACV.

51. This case does not present a dispute about the amount of loss. Plaintiff does not contest Progressive's determination of the amount of loss, nor that the amount of loss exceeded the vehicle's ACV, such that the vehicle was determined by Progressive to be a total loss, i.e., totaled (uneconomical to repair).

52. Moreover, Plaintiff does not contest the *amount* of the PSA. Said another way, it is not that Progressive believes that Policy and Wisconsin law allow for a larger PSA, while

Plaintiff believes that only a lesser PSA is permitted. Rather, Plaintiff alleges that *no PSA is permitted at all* as a matter of law.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Wisconsin residents insured by Progressive Corporation or its subsidiaries who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a vehicle valuation report prepared by Mitchell and the ACV was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine ACV.

54. Plaintiff Wicklein is the proposed class representative for the Class.

55. Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

56. Plaintiff reserves his right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses, or modified in any other way.

57. **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are at least hundreds of Class members, the precise number is unknown to Plaintiff but may be easily ascertained from Progressive's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

58. **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a. Whether Progressive systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

   b. Whether the Mitchell Vehicle Valuation Reports included PSAs to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Progressive for the ACV of Plaintiff's and Class members' total loss vehicles;

   c. Whether representing to claimants that the Mitchell valuation equated with the total loss vehicle's ACV was deceptive;

   d. Whether Progressive's deceptive acts and improper practices injured Plaintiff and members of the Class;

   e. Whether Progressive's acts violated its obligations under the policy of insurance;

   f. Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

   g. Whether Plaintiff and Class members are entitled to an injunction restraining Progressive's future acts and practices.

59. **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named

Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

60. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

61. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Progressive, such that it would be impracticable for the Class members to individually seek redress for Progressive's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT 1
## BREACH OF CONTRACT

62. Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

63. This Count is brought by Plaintiff on his behalf and on behalf of the Class.

64. Plaintiff and each of the other Class Members were insured under a policy issued by Progressive, as described herein. This policy constituted a valid contract.

65. Plaintiff and each of the other Class members made claims under their insurance contracts, which Progressive determined to be complete losses under the insurance contract, and additionally determined to be covered claims.

66. At the time of his claim, and in the time since, Plaintiff has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in his policy.

67. Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Progressive purported to pay Plaintiff and each of the putative Class Members the ACV of their totaled vehicles.

68. Though the use of improper and unfounded PSAs in Mitchell vehicle valuation reports, as detailed above, Progressive handled, adjusted, and paid Plaintiff's claim, and the claims of the members of the proposed Class, far less than the ACV required by the insurance contract.

69. As a direct result of Progressive's breaches, Plaintiff and the members of the Class sustained actual damages.

## COUNT 2
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

70. Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

71. This Count is brought by Plaintiff on his behalf and on behalf of the Class.

72. Every contract, including the Policy at issue, contains an implied covenant of good faith and fair dealing.

73. Defendants had a duty to ensure that Plaintiff and the putative class members were not taken advantage of and a duty to ensure that Plaintiff and the putative class's rights under the contract were not destroyed.

74. To the extent the Policy provides Progressive with the power to calculate the ACV of an insured's total-loss vehicle, Progressive exercised its power unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

75. Progressive breached the covenant of good faith and fair dealing by, *inter alia*:

   a. Intentionally inventing and applying PSAs to undervalue comparable vehicles, and, in turn, insureds' total loss vehicles;

   b. Failing to conduct any investigation or study or research into whether the PSA (i) reflects the used auto market, (ii) is based on accurate data or extrapolations, (iii) is consistent with accepted appraisal methods and practices, or (iv) has any justification whatsoever;

   c. Failing to pay insureds the ACV of their total loss vehicles;

   d. Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total loss claims; and

   e. Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

76. Progressive's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, respectfully request that this Court:

a) Issue an Order Certifying this action as a Class Action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

b) Award damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiff and the Class in an amount to be determined at trial, plus pre- and post-judgment interest, in accordance with law;

c) Disgorgement of Progressive's profits;

d) Appropriate preliminary and/or final injunctive or equitable relief against the conduct of Progressive described herein;

e) Award Plaintiff's and Class Members' costs of suit, including reasonable attorneys' fees as provided by law;

f) Pre- and post-judgement interest on any amounts awarded; and

g) Award such further and additional relief as is necessary to redress the harm caused by Progressive's unlawful conduct and as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 8, 2024　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　/s/*Abou B. Amara, Jr.*
　　　　　　　　　　　　　　　　　　　　Abou B. Amara, Jr. (WI Bar No. 1135419)
　　　　　　　　　　　　　　　　　　　　Daniel E. Gustafson (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　Amanda M. Williams (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　Bailey Twyman-Metzger (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　**GUSTAFSON GLUEK PLLC**
　　　　　　　　　　　　　　　　　　　　120 South Sixth Street #2600
　　　　　　　　　　　　　　　　　　　　Minneapolis, Minnesota 55402
　　　　　　　　　　　　　　　　　　　　Telephone: (612) 333-8844
　　　　　　　　　　　　　　　　　　　　E-mail: aamara@gustafsongluek.com
　　　　　　　　　　　　　　　　　　　　　　　　dgustafson@gustafsongluek.com
　　　　　　　　　　　　　　　　　　　　　　　　awilliams@gustafsongluek.com
　　　　　　　　　　　　　　　　　　　　　　　　btwymanmetzger@gustafsongluek.com

　　　　　　　　　　　　　　　　　　　　Ashlea G. Schwarz (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　Richard M. Paul III (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　Sahil Koul (*pro hac forthcoming*)
　　　　　　　　　　　　　　　　　　　　**Paul LLP**
　　　　　　　　　　　　　　　　　　　　601 Walnut, Suite 300
　　　　　　　　　　　　　　　　　　　　Kansas City, Missouri 64106
　　　　　　　　　　　　　　　　　　　　Telephone: (816) 984-8100
　　　　　　　　　　　　　　　　　　　　E-mail: Ashlea@PaulLLP.com
　　　　　　　　　　　　　　　　　　　　　　　　Rick@PaulLLP.com
　　　　　　　　　　　　　　　　　　　　　　　　Sahil@PualLLP.com

　　　　　　　　　　　　　　　　　　　　***Counsel for Plaintiff***